IN THE COURT OF APPEALS OF NORTH CAROLINA

Nos. COA24-344, COA24-638

Filed 20 May 2026

Mecklenburg County, No. 22CVD008584-590

STEPHANIE AHDI, Plaintiff,

v.

MASOUD AHDI, Defendant.

Appeal by defendant from orders entered 31 May 2023 and 17 October 2023 by Judge Karen D. McCallum in District Court, Mecklenburg County. Heard in the Court of Appeals 8 April 2025.

> *Hamilton Stephens Steele & Martin, PLLC, by Kyle A. Frost and Elizabeth J. James, for plaintiff-appellee.*[1]
>
> *Collins Family & Elder Law Group, by Rebecca K. Watts, for defendant-appellant.*

STROUD, Judge.

Defendant Masoud Ahdi (Father) appeals three orders spanning two cases. The first order, entered 31 May 2023, grants equitable distribution and awards permanent alimony to Plaintiff Stephanie Ahdi (Mother). The second order, entered 21 September 2023, denies his post-trial motion. And the third order, entered 17

---

[1] Plaintiff did not file a brief in File No. COA24-344.

October 2023, holds him in civil contempt for violating a prior child support order, the equitable distribution and alimony order, and a consent order. "Because these appeals involve common questions of law, we consolidate them for appeal pursuant to Rule 40 of the North Carolina Rules of Appellate Procedure." *Hunt v. Hunt*, 112 N.C. App. 722, 724, 436 S.E.2d 856, 858 (1993).

The trial court failed to make the findings of fact and conclusions of law required to grant equitable distribution and award alimony. We therefore vacate that order and remand for a new trial on both claims, though the issues on remand are limited, as discussed below. Because we vacate the equitable distribution and alimony order, we need not address Father's arguments about the order denying his post-trial motion. We also vacate the civil contempt order in its entirety. The court failed to make the required findings of fact about Father's current ability to purge his civil contempt by paying the amounts ordered for child support and alimony. The consent order had also expired by its own terms, so Father could not be held in contempt of it. And to the extent the court held Father in contempt for violating the equitable distribution and alimony order, that basis falls with the underlying order.

## I. Factual and Procedural Background

The parties were married in 2007 and separated on 12 September 2021. Two children were born during their marriage.

On 19 September 2021, Mother filed a complaint seeking a domestic violence protective order (DVPO) against Father. The trial court entered an *ex parte* DVPO

that day and set a future hearing date. On 1 October 2021, the parties entered a separation agreement. It gave Mother sole possession of the marital home "for the duration of the separation" and physical custody of the minor children, with some visitation for Father.[2]

On 7 January 2022, Mother filed a complaint for child custody, child support, postseparation support, equitable distribution, and alimony in Mecklenburg County File No. 22 CVD 556. She voluntarily dismissed the complaint in April 2022. But on 27 May 2022, Mother filed another complaint, raising the same claims in Mecklenburg County File No. 22 CVD 8584. Father filed an answer, denying many allegations, raising various defenses, and asserting counterclaims for child custody, child support, equitable distribution, and attorney's fees.

On 22 July 2022, the parties entered a consent order, "stipulat[ing] and agree[ing] that good cause exists" to enter a civil injunction under Rule 65 of the North Carolina Rules of Civil Procedure (civil injunction consent order). *See* N.C. Gen. Stat. § 1A-1, Rule 65 (2021) ("Every order granting an injunction . . . shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts enjoined or restrained; and is binding only upon the parties . . . ."). Under that order, Mother agreed to dismiss her DVPO claim. And both parties were prohibited

---

[2] Mother's complaint alleges that this agreement is attached to the complaint, but it is not in our record.

from "assault[ing], threaten[ing], abus[ing], follow[ing], harass[ing] (by telephone, e-mail, texting, or through social media) or interfer[ing] with the other party"—"except to communicate regarding the [m]inor [c]hildren." Neither party could come within 100 feet of the other's home. Both had to use the OurFamilyWizard app to communicate about the children. The order "remain[ed] in effect for one . . . year."

On 9 November 2022, the trial court held an initial pretrial conference for the equitable distribution claims and entered an "[i]nitial [p]retrial [c]onference, [s]cheduling, and [d]iscovery order" (initial pretrial order). Both parties were represented by counsel, though neither had yet filed an equitable distribution affidavit. The order required each party to file one "no later than [two] weeks before mediation." The order also identified an issue about the marital business's valuation, appointed an expert to value the marital residence, and directed the parties to exchange written reports from expert witnesses. Lastly, it set a status conference for 25 January 2023.[3]

Our record, however, contains no indication that any of this occurred. There is no evidence that the status conference was held, the mediation took place, or the marital home or business was valued. Nor is there any later scheduling order or pretrial order.

---

[3] The initial pretrial order set the status conference for 25 January 2022, but this is clearly a typographical error.

In any event, on 26 April 2023, the trial court held a hearing on custody and child support and entered two orders—one on permanent custody and one on child support. Both parties appeared *pro se*. The child support order found that Mother earned $8,000 per month and Father earned $9,000 per month. Based on the North Carolina Child Support Guidelines, the court ordered Father to pay $1,239.93 per month in child support, effective 1 May 2022. The court also found that Father owed $12,399.30 in child support "arrearages" and ordered him to pay an additional $250 per month toward that amount, beginning 1 May 2023.[4] Neither party appealed the child support order.[5]

On 22 May 2023, Father moved to continue the equitable distribution and alimony hearing set for 25 May 2023. He alleged that Mother had denied him access to business documentation, preventing him from having the marital business valued. The trial court denied the motion.

---

[4] The order was entered in April 2023, but it states that the effective date and first payment date was 1 May 2022. We assume this was a clerical error.

[5] The trial court identified certain amounts as "arrearages"—a term for child support and alimony that has already been ordered but remains unpaid. *Collins v. Holley*, 299 N.C. App. 323, 325 n.1, 919 S.E.2d 24, 29 n.1 (2025). But no child support or alimony had been ordered before. The amounts were actually past-prospective child support and retroactive alimony. Past-prospective child support covers "the time period between the filing of a claim for child support and entry of an order for child support"; it consists of "newly established child support obligations" rather than payments due under a prior order. *Id.* (citing *Miller v. Miller*, 153 N.C. App. 40, 48, 568 S.E.2d 914, 919 (2002)). Similarly, retroactive alimony is "alimony for the period between the parties' date of separation and the filing of the claim for alimony." *Smallwood v. Smallwood*, 227 N.C. App. 319, 333, 742 S.E.2d 814, 824 (2013). As one of our cases put it: The term "arrears" "normally refers to accrued payments owed under an order," so it "implies there was a prior order"—which did not exist here. *Myers v. Myers*, 269 N.C. App. 237, 265, 837 S.E.2d 443, 462 (2020).

Three days later, on 25 May 2023, the trial court held the equitable distribution and alimony hearing. Mother appeared *pro se*; Father did not appear. According to the transcript, Mother prepared a financial affidavit during the hearing—and one "for" Father as well. But neither affidavit was presented as an exhibit, filed with the trial court, or included in our record (more on this later). The trial court entered its equitable distribution and alimony order on 31 May 2023.

On equitable distribution, the court determined that "an unequal division of the marital property [wa]s equitable." An equal in-kind distribution, the court concluded, "would be impracticable." So a "distributive award [wa]s necessary to effectuate an equitable distribution of the parties' marital estate." The court distributed several assets between the parties and ordered Father to make a $100,000 distributive award payment to Mother.

As for alimony, the court found that Mother's gross monthly income was $5,132.85, with a net income of $1,433.19 and reasonable monthly expenses of $3,059.73. Father's income was "at least" $9,961.01 per month. Based on these findings, the court awarded Mother $1,626.54 per month in alimony. The court also established alimony "arrears"[6] of $17,891.94 and ordered Father to pay $100 per month toward that amount.

---

[6] *See supra* footnote 4.

The day after the hearing, on 26 May 2023, Mother filed two civil contempt motions against Father. The first alleged Father failed to pay child support due on 1 May 2023. The second alleged Father violated the civil injunction consent order by, among other things, contacting and harassing Mother. The same day, the trial court entered a show cause order on both motions, directing Father to appear for a hearing on 25 July 2023.

Father timely filed a post-trial motion on 12 June 2023 under Rules 52, 59, and 60 of the North Carolina Rules of Civil Procedure, seeking relief from the equitable distribution and alimony order.[7] In his motion, Father alleged several problems with the hearing. He had moved to continue the 25 May 2023 hearing on 22 May, and the trial court denied his motion on 24 May 2023. He needed access to accounting information for the parties' business, which Mother possessed. And on the morning of the hearing, he was taken to the hospital with shortness of breath and emailed the court clerk about it. Father also alleged various errors in the court's order.

On 7 July 2023, Mother filed a third contempt motion. She sought to hold Father in both civil and criminal contempt for his alleged failure to comply with the

---

[7] Father's motion had to be filed within ten days after entry of the equitable distribution and alimony order. N.C. Gen. Stat. § 1A-1, Rule 59(b) (2023). Because the tenth day fell on a Saturday, the deadline was automatically extended to the following Monday, making the post-trial motion timely. *See id.* § 1A-1, Rule 6(a) ("The last day of the period so computed is to be included, unless it is a Saturday, Sunday[,] or a legal holiday when the courthouse is closed for transactions, in which event the period runs until the end of the next day which is not a Saturday, Sunday, or a legal holiday . . . .").

equitable distribution and alimony order. The trial court entered a show cause order, setting a hearing for 25 July 2023.

On 17 July 2023, the trial court heard Father's post-trial motion.

On 23 August 2023, Mother filed an amended civil contempt motion and order to show cause (amended civil contempt motion). The motion repeated allegations from her previous contempt motions—that Father failed to comply with the child support order and the equitable distribution and alimony order—and made additional allegations as well. But it did not address any alleged violations of the civil injunction consent order. The trial court entered an amended order to show cause,[8] directing Father to appear on 12 September 2023 "to show cause as to why he should not be held in [c]ontempt . . . for failing to follow" the court's orders. The order also found (based on Mother's motion) there was "probable cause to believe" that Father's conduct constituted civil contempt and that "a hearing should be conducted."

On 12 September 2023, the trial court held a hearing on civil contempt as directed by the amended order to show cause, based on the amended civil contempt motion.[9] Father did not appear. Three days later, the court entered an arrest order

---

[8] The amended order to show cause is labeled "amended," but it does not even refer to the previous show cause orders. It seems to be so named because it was issued in response to Mother's amended civil contempt motion—which itself may be more aptly called Mother's fourth contempt motion.

[9] At the beginning of the hearing, Mother's counsel noted that when they were last in court, Mother had filed "several motions, three motions; the majority of which she was asking [for] criminal relief," and Father "had a public defender." The matter "was continued until today." She noted that she had since filed the amended civil contempt motion and was seeking only civil contempt.

for Father's failure to appear, dated *nunc pro tunc* to 12 September 2023.[10] The order directed "any law enforcement officer" to arrest Father immediately and specified that he "shall not be released from custody by anyone other than [Judge] McCallum, after she receives his bond of $51,273.75 in certified funds, which shall be given directly to [Mother] and not the State of North Carolina."

On 21 September 2023, the trial court entered an order dismissing Father's post-trial motion. The court found that when Father contacted the court on the morning of the equitable distribution and alimony hearing claiming he was going to the hospital, the document he sent "did not look like it was from a medical professional." Father "was, allegedly, prescribed oxycodone and morphine," but the court found his "excuses" and medical care requests were not legitimate. The court also found that Father "was not present at the trial," "was not represented by counsel," and had "acted in bad faith" at certain points during the litigation. Father, the court found, was "attempting to starve out [Mother] and the minor children" and had "not paid any child support" or "spousal support." The court ultimately dismissed Father's post-trial motion.

---

[10] "*Nunc pro tunc*" means "now for then." *Nunc pro tunc*, Black's Law Dictionary (11th ed. 2019). "It signifies a thing is now done which should have been done on the specified date." *Whitworth v. Whitworth*, 222 N.C. App. 771, 777, 731 S.E.2d 707, 712 (2012) (internal quotation marks and citations omitted). *Nunc pro tunc* orders "are allowed only when a judgment has been actually rendered, or decree signed, but not entered on the record, in consequence of accident or mistake or the neglect of the clerk," provided that "the fact of its rendition is satisfactorily established and no intervening rights are prejudiced." *Id.* at 777-78, 731 S.E.2d 712. Our record contains no indication of any "accident or mistake or neglect by the clerk," making the use of *nunc pro tunc* here inappropriate. *Id.*

On 17 October 2023, the trial court entered a contempt order holding Father in civil contempt of the child support order, the equitable distribution and alimony order, and (possibly) the civil injunction consent order. The court entered this order *nunc pro tunc* to 12 September 2023 and ruled:

> 3. Father is in civil contempt of this [c]ourt for his failure to abide by [c]hild [s]upport [o]rder and the [equitable distribution and alimony] [o]rder of this [c]ourt.
>
> 4. Father may purge himself by paying Mother $51,273.75 within fourteen days of the entry of this order.
>
> 5. If Father has not purged himself of contempt within fifteen . . . days of the entry of this order, then Father shall appear in [c]ourt on [27] October . . . 2023 at 9:00 am in courtroom 8170 and he shall go into custody until he has purged his contempt.

The order directed Father to pay $51,273.75 within fourteen days to purge his contempt and to pay Mother's attorney's fees of $8,103. But the *nunc pro tunc* dating creates confusion about when the fourteen days began to run—either 12 September 2023 (making payment due by 26 September) or 17 October 2023 (making payment due by 31 October 2023).[11]

---

[11] Technically, entering the civil contempt order *nunc pro tunc* to 12 September 2023 means Father was ordered to pay the purge amount within fourteen days of that date—by 26 September 2023. But the order was not actually filed and therefore *entered* under Rule 58 of the North Carolina Rules of Civil Procedure until 17 October 2023. *See* N.C. Gen. Stat. § 1A-1, Rule 58 (2023) ("[A] judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court . . . ."). Counting from the actual "entry of this order," the purge payment would be due fourteen days later, on 31 October 2023. But Father was ordered to appear in court four days earlier, on 27 October, to go into custody unless he had already paid.

On 26 October 2023, Father appealed from the civil contempt order and "any intermediate orders involving the merits and necessarily affecting the said order." He also appealed the equitable distribution and alimony order and the order dismissing his post-trial motion.

## II. Jurisdiction

The orders on appeal are final and appealable, and Father's notices of appeal are timely.

Generally, "a party must file and serve a notice of appeal . . . within thirty days after service" of the judgment. N.C. R. App. P. 3(c)(2). But a timely post-trial motion tolls the thirty-day deadline. *See* N.C. R. App. P. 3(c)(3) ("[I]f a timely motion is made by any party for relief under Rules 50(b), 52(b) or 59 of the Rules of Civil Procedure, the thirty-day period for taking appeal is tolled as to all parties until entry of an order disposing of the motion and then runs as to each party from the date of entry of the order . . . .").

Father filed his post-trial motion on 12 June 2023, twelve days after the equitable distribution and alimony order was entered. *See id.* 3(c)(2). That tolled the time to appeal. *See id.* 3(c)(3). The appeal period began running when the trial court dismissed the post-trial motion on 21 September 2023. *See id.* The dismissal order was served on 4 October 2023. Twenty-two days later, on 26 October 2023, Father filed his notice of appeal. *See id.* That notice appealed both the equitable distribution and alimony order and the order dismissing his post-trial motion. Father also timely

appealed the civil contempt order on 26 October 2023—nine days after it was entered. *See id.* 3(c)(2). Father's appeals are properly before this Court.

### III. Observations Concerning This Appeal

This case has several flaws that make our review difficult. It does not quite reach the level of *Hill v. Hill*, where we said the appeal "embod[ied] *all* of the flaws that could possibly create an abominable appeal of an equitable distribution judgment." 229 N.C. App. 511, 514-15, 748 S.E.2d 352, 355-56 (2013) (emphasis added). But it comes close. So we begin our analysis by addressing some threshold issues.

As noted above, Mother prepared financial affidavits during the hearing—one for herself and one "for" Father. Neither was presented as an exhibit, filed with the trial court, or included in our record. The trial court referenced Mother's financial affidavit in its order, finding that Mother "has reasonable and necessary expenses totaling at least $3,059.73 (*see attached [f]inancial [a]ffidavit*) leaving Mother with a monthly deficient of $1,626.54." But the affidavit was *never* attached to the order or included in the trial court file. Counsel for both parties searched for it and could not find it.[12] So it is not in our record.

The affidavits are not the only missing evidence. Mother brought a binder of documents to the hearing, including "a summary" that would "tell[ ]" the court (in her

---

[12] During the hearing, Mother referred to paper documents but ultimately emailed the affidavit she had prepared to the trial court.

words) "exactly what it is [she was] looking for" and provide "evidence to show all of the reasons [she] th[ought] that" her requests were "correct." During her testimony, she mentioned other documents—an appraisal of the marital home, mortgage information, and more. Had Mother offered these documents as exhibits and had the court admitted them, Superior Court Rule 14 would have required filing them with the clerk. *See* N.C. Super. Ct. & Dist. Ct. R. 14 ("Once any item of evidence has been introduced, the clerk . . . is the official custodian thereof and is responsible for its safekeeping and availability for use . . . . After being marked for identification, all exhibits offered or admitted in evidence . . . shall be placed in the custody of the clerk, unless otherwise ordered by the court."). But that did not happen. None of the binder's contents appear in the transcript or court file.

That matters because Father was not present to object to any of this evidence. Had Mother offered the documents as exhibits and had the court admitted them, we could not consider any objection Father might raise now. N.C. R. App. P. 10(a)(1) ("In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion . . . ."); *Bethesda Rd. Partners, LLC v. Strachan*, 267 N.C. App. 1, 7, 832 S.E.2d 503 (2019) (noting that a party "cannot raise on appeal issues which were not pleaded or raised below"). For purposes of our review, we would treat the exhibits as properly admitted, and the trial court could have relied on them in its findings. But Mother did not offer them. The court did not admit them. And we have nothing in our record beyond Mother's testimony.

This missing evidence stems partly from both parties' failure to comply with basic procedural requirements. North Carolina General Statute Section 50-21 and the Mecklenburg County Local Rules require parties in equitable distribution and alimony cases to file specific financial affidavits before trial. *See* N.C. Gen. Stat. § 50-21(a) (2023) ("[T]he party who first asserts the claim shall prepare and serve upon the opposing party an equitable distribution inventory affidavit . . . . Within 30 days after service of the inventory affidavit, the party upon whom service is made shall prepare and serve an inventory affidavit upon the other party."); Twenty-sixth Judicial District Local Rules 10.1 ("In all cases involving claims for . . . alimony . . . both [p]arties shall file and serve an [affidavit of financial standing] long form . . . .") [Mecklenburg County Local Rule]; Mecklenburg County Local Rule 13.2 ("Each [p]arty shall file an [equitable distribution] [a]ffidavit with the [c]ourt and serve a copy on the opposing [p]arty using [l]ocal [f]orm CCF-33."). Neither party did so.

Mother, as "the party who first assert[ed]" the equitable distribution claim, had the first obligation. N.C. Gen. Stat. § 50-21(a). She had to file and serve her "equitable distribution inventory affidavit" "within [ninety] days." *Id.* She did not. Only after Mother served her affidavit would Father's obligation kick-in—he would have had thirty days to serve his own. *See id.* ("Within [thirty] days after service of the inventory affidavit, the party upon whom service is made shall prepare and serve an inventory affidavit upon the other party."). Because Mother never served her affidavit, Father's deadline never triggered.

The trial court tried to address the problem. The initial pretrial order noted that the equitable distribution affidavits had "not been filed and served in a timely manner." So the court imposed a new deadline: the parties had to file and serve the affidavits, and any "required attached documentation,"[13] "no later than [two] weeks before mediation." But again, there is no evidence that mediation happened; the court-ordered deadline never came.

At the hearing itself, the trial court raised the issue one more time. It told Mother that both parties were "supposed to file financial affidavits for equitable distribution" and for alimony. The court checked its file and confirmed that neither party had filed any affidavits. So it sent Mother downstairs to get "a packet for equitable distribution, [postseparation support] and alimony" with "all of the forms" and took a brief recess to allow her to complete them.

What happened during that recess is puzzling. According to the transcript, Mother filled out financial affidavits and equitable distribution inventory affidavits for herself and "for" Father. How she could have completed Father's affidavits is unclear—she testified she lacked access to his current income or business records. In

---

[13] Under Mecklenburg County Local Rule 13.3, titled "Mandatory Discovery," the required "attached documentation" for the equitable distribution affidavit includes documents "concerning . . . assets and debts"—these documents should contain specific information about a party's real estate, transportation, bank accounts, life insurance policies, retirement benefits, and debt. Mecklenburg County Local Rule 13.3 ("At the same time a [p]arty serves his or her . . . [a]ffidavit upon the opposing [p]arty, the [p]arty shall also serve upon the opposing [p]arty copies of the following documents concerning the assets and debts listed in the . . . [a]ffidavit: [lists property described above] . . . .").

any event, although Mother apparently prepared these affidavits and showed them to the court, none were offered as evidence, admitted, or included in the court file.

Mother therefore presented her case with testimony alone. Father did not appear and raised no objections. To the extent that the trial court's findings can be supported by Mother's testimony, they can be upheld. But Mother's testimony was neither detailed nor comprehensive. Without supporting documentation, it left significant gaps.

Despite these gaps, Mother argues that Father's absence resolves everything. Because he was not present at the hearing, she contends, we should accept the trial court's findings without question. In her view, Father waived all appellate review by failing to appear. Father certainly cannot raise some issues on appeal—he cannot, for instance, challenge the admission of evidence he never objected to. But he has not raised those issues; we discuss this further in the next section.

Mother's argument overlooks her own obligations. She filed the equitable distribution and alimony claims, so she bore the burden of proof on both. *See*, *e.g.*, *Crago v. Crago*, 268 N.C. App. 154, 165, 834 S.E.2d 700, 708 (2019) ("The spouse asserting the claim for alimony has the burden of proving dependency."); *Albritton v. Albritton*, 109 N.C. App. 36, 40, 426 S.E.2d 80, 83 (1993) ("[T]he party claiming an interest in [an asset], ha[s] the burden of proof as to the value of the [asset] on the date of the parties' separation."). Despite that burden, she failed to comply with Section 50-21 and the Mecklenburg County Local Rules. She never served the

required affidavits on Father, yet she set the claims for hearing anyway. And when the hearing arrived, she presented her case without offering any documentary evidence.

That Mother appeared *pro se* does not excuse any of this. As always, *pro se* litigants must follow the same rules as represented parties. *See Sheffer v. Rardin*, 208 N.C. App. 620, 631, 704 S.E.2d 32, 39 (2010) ("A person who chooses to represent himself is bound by the same rules as one who is represented by counsel; to hold otherwise would be manifestly unfair to the represented party and contrary to established law."). Both parties have since retained counsel for this appeal, and their attorneys have addressed the issues "with as much skill as the record would permit." *State v. Pritchard*, 227 N.C. 168, 169, 41 S.E.2d 287, 287 (1947).

Overall, "the manner in which this appeal has been presented fundamentally hampers our review." *Hill*, 229 N.C. App. at 514, 748 S.E.2d at 356. This Court "sits as a reviewer of the actions of the trial court" and, "[i]n that role, we must be impartial to all parties." *Id.* Unlike the parties in *Hill*, both parties here have filed briefs and made good arguments.[14] Still, our ability to review the orders remains limited by what is—and is not—in the record.

We appreciate the trial court's effort to resolve this case expeditiously despite the parties' failures to comply with our General Statutes or the Mecklenburg County

---

[14] Mother did not file a brief in the civil contempt order appeal. *See* file no. COA 24-344.

Local Rules. Trial courts are "overworked and understaffed." *Id.* at 515, 748 S.E.2d at 356. Even so, "it is ultimately the responsibility of the trial judge to insure that any judgment or order is properly drafted, and disposes of all issues presented to the court before the judge affixes his or her signature to the judgment or order." *Id.* This responsibility is "particularly true in a complex case, such as one involving the equitable distribution of marital property." *Id.*

Given the record before us, we will consider Mother's testimony from the hearing as the available evidence and address Father's arguments on that basis. We cannot speculate about what may have been in her binder.

## IV. Waiver by Failing to Appear

As noted above, Father failed to appear at both the equitable distribution and alimony hearing and the contempt hearing. Mother argues, based entirely on one unpublished and thus non-precedential case, *Armstrong v. Pentz*, 246 N.C. App. 514, 785 S.E.2d 185, 2016 WL 2507700, at *1 (2016) (unpublished), that Father "has failed to preserve his issues for appeal by his willful failure to not be present at the trial and this appeal should be dismissed." In *Armstrong*, this Court concluded that the defendant "failed to preserve her issues for appeal as a result of her willful failure to be present at trial." *Id.* at *3. Mother contends that like "the defendant in *Armstrong*, [Father] has failed to preserve his issues for appeal as a result of his own willful failure to be present at trial."

Father counters that only some trial court decisions require contemporaneous objection to preserve appellate review. Evidentiary rulings fall into that category— "if a party wants to make an argument on appeal about the admission or exclusion of evidence," he must object at trial. But according to Father, the issues here are different. They concern "the trial court's ultimate order on the parties' written requests for relief for equitable distribution and alimony—not . . . how the trial was conducted or what evidence was admitted." Father's argument is that the evidence presented "was not sufficient to support the trial court's ultimate ruling," making that "ruling . . . a misapplication of the law."

Rule 10(a)(1) of the North Carolina Rules of Appellate Procedure states:

> [T]o preserve an issue for appellate review, a party must have [1] presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context[, and] [2] obtain[ed] a ruling upon the party's request, objection, or motion.

N.C. R. App. P. 10(a)(1). The rule "is directed to matters which occur at trial and upon which the trial court must be given an opportunity to rule." *State v. Canady*, 330 N.C. 398, 401, 410 S.E.2d 875, 878 (1991). It "prevent[s] unnecessary new trials caused by errors . . . that the court could have corrected if brought to its attention at the proper time." *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 195, 657 S.E.2d 361, 363 (2008). It does not apply to alleged deficiencies in

the trial court's written findings and conclusions that become apparent only when the order is entered.

The case Mother cites—*Armstrong*, 2016 WL 2507700, at *1—illustrates the distinction. The defendant there was involved in an ongoing child custody dispute. *Id.* Beginning in April 2013, she "filed repeated frivolous motions seeking to delay any change in custody." *Id.* The trial court granted her motion to continue the trial to July 2014 and "specifically ordered" that she, her counsel, or substitute counsel be prepared for trial. *Id.* When neither the defendant nor her counsel appeared, the court called counsel's office three times, eventually reaching him around 11:00 a.m. *Id.* The court gave the defendant "one additional day to present themselves to the [c]ourt for trial." *Id.* The next day, her counsel emailed: the defendant's "position remained unchanged; she would not be present in court for trial." *Id.* at *2. The court proceeded with the hearing. *Id.*

On appeal, the defendant argued that (1) her "due process rights were violated where her trial attorney labored under an unwaivable conflict of interest," and (2) the "plaintiff failed to establish a change in circumstances to justify awarding [him] primary custody." *Id.* Both arguments required objection at trial to preserve them. *Id.* And both challenged errors that occurred during the hearing could have been fixed on the spot.

The conflict-of-interest claim raised a constitutional issue, and we rarely decide such issues in the first instance. *See Mitchell v. Mitchell (now Norwich)*, 199

N.C. App. 392, 409, 681 S.E.2d 520, 531 (2009) ("[A]ppellate courts will not ordinarily pass upon a constitutional question unless it affirmatively appears that such question was raised and passed upon in the trial court." (citation omitted)). Further, the defendant could have raised the alleged conflict before or during the hearing, allowing the trial court to rule on it. The sufficiency claim challenged whether the plaintiff had presented enough evidence to show a "substantial change in circumstances." *Armstrong*, 2016 WL 2507700, at *2. The defendant could have objected to the plaintiff's evidence as it came in or presented her own rebuttal evidence. Either way, the trial court could have heard additional evidence, reconsidered what was presented, or ruled differently altogether.

Had the defendant appeared and raised these issues, the court could have corrected the errors then and there. But she chose "not to be present at the custody hearing after multiple continuances at her request." *Id.* at *4. So this Court held that she could not raise the issues on appeal. *Id.*

This case is different. Father mainly challenges whether (1) the orders contain the necessary findings of fact and conclusions of law, and (2) the findings and conclusions that do exist are legally correct. These supposed deficiencies became apparent only when the written orders were entered. Father could not have objected during the hearing to findings that did not yet exist or to legal errors that had not yet been made. The trial court could not have corrected issues in its written findings and conclusions until after it drafted them. Put another way: These are not errors "that

the [trial] court could have corrected if brought to its attention at the proper time"
during the hearing. *Dogwood*, 362 N.C. at 195, 657 S.E.2d at 363.

Mother has not demonstrated that Father's appeal should be dismissed. His
failure to appear limits the issues he may raise on appeal, but he may still challenge
whether the orders contain the necessary findings of fact and conclusions of law and
are legally correct.

## V.     Orders on Appeal

Father appeals three orders: the equitable distribution and alimony order, the
order denying his post-trial motion, and the civil contempt order.

A trial may properly award permanent alimony before completing equitable
distribution. *See* N.C. Gen. Stat. § 50-16.3A (2023) ("The claim for alimony may be
heard on the merits prior to the entry of a judgment for equitable distribution . . . .").
Here the court resolved both claims at once. Because our resolution of the equitable
distribution appeal will affect the parties' overall financial circumstances—
circumstances relevant to alimony—we begin with Father's equitable distribution
arguments.

As explained below, we vacate the equitable distribution and alimony order
and remand for a new trial. That disposition affects the remaining orders in two
ways. First, we need not address Father's arguments about the order denying his

post-trial motion.[15]  Second, we must vacate the civil contempt order to the extent it

rested on the equitable distribution and alimony order.  Father also challenges his

contempt finding based on the child support order and (perhaps) the civil injunction

consent order.  We take up those challenges after the equitable distribution and

alimony order.

## A.  Equitable Distribution

We start by outlining the standard of review that frames our analysis before

turning to the merits.

### 1.  *Standard of Review*

> Our review of an equitable distribution order is limited to
> determining whether the trial court abused its discretion
> in distributing the parties' marital property.  Accordingly,
> the findings of fact are conclusive if they are supported by
> any competent evidence from the record.
>
> However, even applying this generous standard of review,
> there are still requirements with which trial courts must
> comply. Under [North Carolina General Statute Section]
> 50–20(c), equitable distribution is a three-step process; the
> trial court must (1) determine what is marital and divisible
> property; (2) find the net value of the property; and (3)
> make an equitable distribution of that property.

*Watson v. Watson*, 261 N.C. App. 94, 96-97, 819 S.E.2d 595, 598 (2018) (citation

omitted); *see also* N.C. Gen. Stat. § 50-20(c) (2023) ("There shall be an equal division

---

[15] Father's post-trial motion centered on the court's denial of his motion to continue due to his alleged medical issue and hospital visit.  On appeal, he argues that the court (1) abused its discretion in denying that continuance, and (2) should have realized that Mother could not present adequate evidence to support entry of a proper equitable distribution order.

by using net value of marital property and net value of divisible property unless the court determines that an equal division is not equitable. If the court determines that an equal division is not equitable, the court shall divide the marital property and divisible property equitably.").

## 2. *Valuation of Marital Property*

Father's arguments focus mostly on the second step of the equitable distribution process—valuing the marital property—and on the trial court's unequal distribution.[16] He argues that the trial court erred "because no evidence was presented regarding the date of separation net value of proper[ty] alleged to be marital." Father challenges the court's valuation of the three largest marital assets— the marital home, the Grover land property, and the business—contending that the findings either are absent altogether or lack evidentiary support for the assets' net values at the date of separation. These defects, he maintains, require us to reverse the equitable distribution and alimony order and remand for a new trial.

Father challenges finding 34 as unsupported by the evidence:

> 34. During the course of their marriage, the parties acquired the following property, which was owned on the date of separation, which the court finds to be marital property, and to have the corresponding value:

| ASSETS | VALUE |
| --- | --- |
| **Real Estate** | |
| [Redacted address] (marital home) | $455,000 ($147,000) |

---

[16] Father mentions classification of the property in his arguments but focuses primarily on the findings about the assets' valuation.

| Grover NC Land Parcel 52937 . . . and Parcel 6664, [redacted address] | $15,000 |
|---|---|
| | |
| **Family Business** | |
| Skyla/CMCU [b]usiness [c]hecking and [s]avings ([c]ash on hand) | $104,888 |
| United Auto LLC (Inventory Value) | $667,849 |
| | |
| **Vehicles** | |
| 2012 Land Rover LR4 HSE LUX | $12,510 |
| | |
| **Accounts** | |
| Cryptocurrency | $4[,]209 |

And within finding 34, the trial court made additional findings about each asset. For the marital home, it found that (1) the property "appraised for $455,000 by Stegall Appraisal Co. Inc." on 17 May 2023; (2) "[t]here was no evidence provided regarding the date of separation value"; (3) the "remaining mortgage/lien amount [is] $147,000 with Freedom Mortgage"; and (4) Father "was ordered to pay the mortgage and willfully failed to do so."[17] For the Grover property, the court found that the property "was purchased on 12 March 2019 for $15,000," but that "[n]o other evidence of value was offered to the court." And for the business, it found that the inventory ($667,849) and "cash on hand" ($104,888) were valued "as of November 2021" and that "no other evidence of value was offered at trial."

---

[17] Mother testified that she and Father "had an agreement" he would pay the mortgage, but there was no court order. The trial court asked: "Who ordered him to pay the mortgage?" Mother said that Father "did it." "From the beginning he always paid it." But she acknowledged that there "was no court order." This portion of finding 34 is unsupported by the evidence.

To "enter a proper equitable distribution judgment, the trial court must specifically and particularly classify and value all assets and debts" the parties maintained "at the date of separation." *Watson*, 261 N.C. App. at 97, 819 S.E.2d at 598 (citation omitted). In determining a property's value, the court "must consider [its] market value, if any, less the amount of any encumbrance serving to offset or reduce the market value." *Id.* And "in doing all these things[,] the court must be specific and detailed enough to enable a reviewing court to determine what was done and its correctness." *Id.*

Section 50-21(b) establishes the date of separation as the relevant valuation date for marital property:

> (b) For purposes of equitable distribution, *marital property shall be valued as of the date of the separation* of the parties, and evidence of preseparation and postseparation occurrences or values is competent as corroborative evidence of the value of marital property as of the date of the separation of the parties. *Divisible property and divisible debt shall be valued as of the date of distribution.*

N.C. Gen. Stat. § 50-21(b) (emphasis added).

"In an equitable distribution action, the burden of proof" falls on "the party claiming that property is marital property to show by a preponderance of the evidence that the property: (1) was acquired by either spouse or both spouses; (2) during the marriage; (3) before the date of the separation of the parties; and (4) is presently owned." *Moore v. Jordan*, 259 N.C. App. 590, 593, 816 S.E.2d 218, 221 (2018) (citation

omitted). That party "must also provide evidence by which that property is to be valued." *Id.*

The trial court found "no evidence as to divisible property," making the relevant valuation date 12 September 2021, the date of separation. *See* N.C. Gen. Stat. § 50-21(b). Mother—as the party seeking equitable distribution of the listed items as marital property—bore the burden of presenting evidence of each item's value at that date. We address each of Father's challenges in turn.

### a. *Marital home value*

Father claims that the trial court erred in valuing and distributing the marital home because neither the evidence nor the findings established its date-of-separation value. Mother responds that she "testified that the date of separation value of the marital home was $391,000" and "presented an appraisal report" valuing the home at $455,000 as of 17 May 2023. The appraisal was apparently in Mother's binder, but (again) that was never admitted into evidence and is not in our record. If the court erred in not finding a date-of-separation value, Mother posits, we should remand only "to determine [the] date of separation value."

One of the most basic requirements for equitable distribution is valuing marital property as of the date of separation, provided the trial court has any evidence upon which to value the property. *See Hunt*, 112 N.C. App. at 729, 436 S.E.2d at 861 (reversing in part an equitable distribution judgment that did not "reflect that the property was valued . . . on 'the date of the separation of the parties' " (quoting N.C.

Gen. Stat. § 50-21(b) (1992)); *Glaspy v. Glaspy*, 143 N.C. App. 435, 440, 545 S.E.2d 782, 786 (2001) ("Without a full determination of the net value as of the date of separation of distributed items, the trial court cannot be said to have divided the property equitably.").

Here, Mother's testimony about the marital home's value and the mortgage owed was minimal and cryptic. And although she referred to documents that are not in evidence, her testimony supports the trial court's findings as to the home's value at the time of the hearing.

> [Mother]: . . . I had an appraisal done on the house last week, and my numbers–I don't want to give you the wrong numbers, but the appraisal is in here. [Referring to the binder] And the house came in at [$450,000], and we owe a [$148,000] on it. And so there's equity in the house of . . . roughly [$304,000].
>
> And if you turn to the second page . . . of the [binder] . . . you'll see I've done like a little–
>
> [Court]: I'm sorry, what's . . . left on [the] mortgage?
>
> [Mother]: . . . I want to say it's [$147,000]/[$148,000].
>
> [Court]: What was the date of separation?
>
> [Mother]: September 21[,] . . . 2021.
>
> [Court]: What was the date of separation value of the home?
>
> [Mother]: Oh, that I don't know because the . . . appraiser said that she usually, when she does it, she usually just says current appraisal.
>
> [Court]: No, I need that–

- 28 -

[Mother]: You[ ] need that.

[Court]: –for equitable distribution.

[Mother]: Okay.

[Court]: I need date of separation value.

[Mother]: Okay.

[Court]: And then I need present day value.

Later, after the recess during which Mother had prepared the equitable distribution affidavits for both herself and Father, she testified about the home's date-of-separation value:

> [Court]: Um, so the marital home, the date of separation was the [$391,000] value?
>
> [Mother]: Correct.
>
> [Court]: [$360,000]. And so now it's [$455,000].
>
> [Mother]: Correct.
>
> [Court]: Mortgage of [$147,000]. And then, so you have about [$304,000] in equity.
>
> [Mother]: Yes, ma'am.

This testimony supports the trial court's finding that, as of the hearing date, the home was valued at $455,000 and the outstanding mortgage balance was $147,000. Interpreting her testimony generously, Mother presented evidence of the mortgage balance when she responded "[y]es, [m]a'am" to the trial court's statement, "[m]ortgage of [$147,000]." The court reflected this value in finding 34 by placing the

mortgage amount in parentheses ($147,000) after the appraised value of $455,000. While the court did not expressly find a net value, these figures yield a net value of $308,000 at the time of the hearing.

Mother's testimony on the home's date-of-separation value, however, is contradictory, and there is no evidence of the mortgage balance on that date. The trial court asked whether the home's date-of-separation value was $391,000, and Mother responded "correct." But immediately after, the trial court stated "[$360,000]. And so now it's [$455,000]," and Mother again responded "correct," apparently confirming both $391,000 and $360,000 as the date-of-separation value. The court did not make a finding resolving this discrepancy. And even if it had, the record still lacks evidence of the home's *net value* at the date of separation because Mother presented no testimony about the mortgage balance on that date.

In *Hill*, this Court vacated the equitable distribution order as to the marital home and remanded for a new order because the trial court failed to find the marital home's net value at the date of separation. *Hill*, 229 N.C. App. at 529, 748 S.E.2d at 364. We do the same here. As the trial court itself recognized, it needed a "date of separation value . . . for equitable distribution." *See Watson*, 261 N.C. App. at 97, 819 S.E.2d at 598 ("[T]o enter a proper equitable distribution judgment, the trial court must specifically and particularly . . . value all assets and debts maintained by the parties at the date of separation." (citation omitted)).

In short, the marital home was one of the three largest marital assets. Without a net value at the date of separation, the marital estate's value cannot be determined, and the order must be vacated and remanded. *See Williamson v. Williamson*, 217 N.C. App. 375, 379, 719 S.E.2d 628, 632 (2011) (vacating and remanding an equitable distribution order where the record was "devoid of any evidence as to the [marital residence's] value . . . at the date of separation").

b. *Grover property value*

Father claims that finding 34 and paragraph 3 of the distribution are "in error" because the trial court made no finding of the land's date-of-separation value. Mother presented no evidence of that value. Mother essentially concedes the point, noting "there was a dearth of evidence presented regarding the date of separation value of the Grover property." She again contends that if the trial court erred, we should remand only for the court to determine the property's date-of-separation value.

The trial court found that the Grover property's value was $15,000. Although Finding 34 does not specify the valuation date, the value appears to be as of the hearing date. But the trial court also found that the Grover property was "purchased on [12 March 2019] for $15,000" and that "[n]o other evidence of value was offered to the court." The parties did not separate until 2021—two years after the purchase. The 2019 purchase price, without more, does not establish the property's value at either the date of separation or the date of the hearing. This portion of finding 34 is therefore unsupported by the evidence and vacated.

c. *Business value*

Father acknowledges Mother testified that the business's inventory value was $667,849 and that it had cash on hand of $104,888. These figures in finding 34 are thus supported by the evidence. But according to Father, these findings did not reflect the business's date-of-separation value. And Mother offered no evidence of the business's date-of-separation value. Mother claims that the trial court had sufficient evidence to value the business based on her testimony.

> In valuing a marital interest in a business, the task of the trial court is to arrive at a date of separation value which reasonably approximates the net value of the business interest. . . . It is imperative that the trial court make specific findings regarding the value of a business and the existence and value of its goodwill, and should clearly indicate the evidence on which its valuations are based, preferably noting the valuation method or methods on which it relied.

*Quesinberry v. Quesinberry*, 210 N.C. App. 578, 585, 709 S.E.2d 367, 373-74 (2011) (internal citations and brackets omitted). On appeal, we do not disturb a business's valuation if the trial court "reasonably approximated the net value of the business and its goodwill, if any, based on competent evidence and on a sound valuation method." *Id.* at 585, 709 S.E.2d at 374 (citation omitted). But the trial court's obligation to make these specific findings "exists only when there is credible evidence supporting the value of the asset." *Id.* at 586, 709 S.E.2d at 374 (citation omitted).

Mother testified that "the inventory value of [the business], when [the parties] separated in September of 2021 . . . was [$667,848] worth of inventory."[18] She continued: "that's inventory only, not profit. . . . I didn't factor property[19] in because there's no way to know profit." As she put it, "I can't; *I can't just make it up, right.*" (Emphasis added.) Shortly after, this colloquy occurred:

> [Court]: You need something from–
>
> [Mother]: Solid from me though, is what you're saying to me[?]
>
> [Court]: Well I have to write an order. . . . And local rules . . . require you guys to file a financial affidavit and neither one of you have done that.

After this exchange, Mother left to fill out the two equitable distribution affidavits—"one for [her], and one for [Father]"—that are not in our record. Later, she testified about the business checking account's date-of-separation value:

> [Mother]: [T]here's a cash–property, yeah–yes[.] There's a cash–there was a bank balance at the business, in the business account, for [$104,888], that was cash in the bank.
>
> [Court]: This is [an] account for what?
>
> [Mother]: For United Auto.
>
> [Court]: No, no, how much was it?

---

[18] The trial court found that the business's inventory was worth $667,849. This one-dollar discrepancy is "*de minimis* at best." *Dechkovskaia v. Dechkovskaia*, 232 N.C. App. 350, 355, 754 S.E.2d 831, 835 (2014).

[19] In context, Mother may have said (or may have meant to say) "profit" instead of "property," but this is what our transcript says.

[Mother]: [$104,888]

Mother is correct that she testified about some of the business's inventory and cash on hand, but that testimony does not support a finding of the business's value at either the date of separation or the date of the hearing. The trial court found that the business's inventory value and "cash on hand" were "*as of November 2021*" and that "no other evidence of value was offered at trial." (Emphasis added.) The parties separated in September 2021, so the court made no findings on the business's date-of-separation value. And the court's finding makes clear that the $667,849 figure represents only the "inventory value," not the business's value. There is no finding on the business's net value or even a date-of-separation value for the inventory or cash.

As Mother herself recognized when attempting to provide evidence of the business's value, she "can't just make it up"—the trial court needed something "solid" from her. Mother bore the burden of proving the business's date-of-separation value, but she never provided that "solid" evidence. *See Albritton v. Albritton*, 109 N.C. App. 36, 40, 426 S.E.2d 80, 83 (1993) ("[T]he party claiming an interest in the [asset] . . . ha[s] the burden of proof as to the value of the [asset] on the date of the parties' separation."). We cannot know what Mother included in the affidavits; they apparently provided no more information about the business's value than her testimony did, since the court's findings address only the $667,849 inventory value

as of November 2021. Mother testified about the business's $104,888 checking and savings account balance *after* preparing the affidavit. But a business's inventory value and bank account balance are not the business's net value. Because the business was not valued at the date of separation, this portion of finding 34 is unsupported by the evidence.

### d. Scope of relief on remand

On each of the three marital assets discussed above, Mother—the party bearing the burden of proof on valuation—failed to present sufficient evidence for the trial court to find each asset's net fair market value at the date of separation. We vacate the court's order distributing those assets. Now, we must decide the proper relief to grant on appeal.

As noted above, Mother asks that if we hold the trial court erred, we should remand only "to determine [the asset's] date of separation value." Father urges us to reverse the order entirely and remand "for a new trial."

When the evidence is insufficient to establish a marital asset's date-of-separation value, the trial court has at least two options. First, it may decline to distribute the asset. In *Grasty v. Grasty*, this Court affirmed the trial court's decision not to value and distribute a marital business interest because "the defendant failed to present credible evidence" on the business's value. 125 N.C. App. 736, 739, 482 S.E.2d 752, 754 (1997). Second, the court may "appoint an expert to appraise the asset," though it need not do so. *Id.* at 739-40, 482 S.E.2d at 754. As we observed in

*Grasty*, "the trial court may appoint an expert to value an asset in an equitable distribution proceeding" and "call that expert as a witness in the trial." *Id.* at 740, 482 S.E.2d at 754 (citations omitted). The decision whether to do so is within the court's "sound discretion." *Id.* at 740, 482 S.E.2d at 755.

Here, the initial pretrial order appointed Matt McDonald "as a court appointed expert to value the marital residence," with costs to be "split equally between the parties." It provided that his "report may be received into evidence without further authentication and without the expert being present in [c]ourt." The parties were not bound by Mr. McDonald's appraisal; they could have presented other expert witnesses' valuations. The order also identified "discovery issues" regarding the "business['s] valuation" and included provisions for discovery and exchange of expert reports.

We mention the initial pretrial order because we consider all the trial court's orders in evaluating the appropriate relief on appeal. Mother asks that we remand only to determine date-of-separation values on the existing record, but if we granted that request, the court would be unable to value or distribute the bulk of the marital estate, to Mother's own disadvantage. Father requests a new trial on all issues, but we do not ordinarily grant that relief. *See Miller v. Miller*, 97 N.C. App. 77, 80, 387 S.E.2d 181, 184 (1990).

In *Miller*, a judgment had been filed against the husband and wife during the marriage. *Id.* at 78, 387 S.E.2d at 182. On appeal, the husband argued that the trial

court "erred in failing to classify, value and distribute, as marital debt, the judgment" against both parties. *Id.* at 79, 387 S.E.2d at 183. We held that because the husband (as the party "claiming the property . . . to be marital") had "failed in his burden to present evidence from which the trial court c[ould] classify, value and distribute the property," he could not claim error on appeal. *Id.* at 80, 387 S.E.2d at 184. As for the appropriate relief on appeal, this Court explained:

> [W]e will not remand the case for the taking of new evidence. The parties have had ample opportunity to present evidence and have failed to do so. The requirements that the trial court (1) classify and value all property of the parties, both separate and marital, (2) consider the separate property in making a distribution of the marital property, and (3) distribute the marital property, necessarily exist only when evidence is presented to the trial court which supports the claimed classification, valuation and distribution. Furthermore, remanding the matter for the taking of new evidence, in essence granting the party a second opportunity to present evidence, would only protract the litigation and clog the trial courts with issues which should have been disposed of at the initial hearing.

*Id.* (internal citations and quotation marks omitted). Both parties here share the blame for the evidentiary deficiencies at the hearing. Neither party's proposed remedy is appropriate.

In our discretion, we follow *Hill v. Hill* and vacate the equitable distribution and alimony order as to the identified assets' valuation and distribution and remand for additional evidence. *See Hill*, 229 N.C. App. at 530, 748 S.E.2d at 365 ("[W]e vacate portions of the equitable distribution order, and remand. We first note that,

on remand, the trial court must receive additional evidence as to matters which must be considered as of the time that the distribution of marital property is to become effective."). Father has not challenged the marital assets' identification or classification on appeal. Mother testified that each asset was acquired during the marriage and owned on the date of separation, so they were properly classified as marital.

On remand, the trial court shall address only the assets identified in the order on appeal; neither party may present evidence of other alleged marital assets not identified in that order. Because we vacate the assets' valuation, the court shall receive additional evidence as necessary to make findings on each asset's net value at the date of separation and the date of distribution. If the evidence remains insufficient to find an asset's net fair market value at the date of separation, the court should not value or distribute it.

Father also argues that the trial court failed to make findings of fact and conclusions of law supporting a distributive award rather than an in-kind distribution and failed to find he had sufficient liquid assets to pay the $100,000 distributive award within 120 days of the order's entry.[20] Because we vacate and

---

[20] The date by which Father was required to pay the $100,000 distributive award is itself unclear. The order was entered—written, signed, and filed—on 17 October 2023, but entered *nunc pro tunc* to 12 September 2023. Depending on which date controls, the payment deadline fell on either 10 January 2024 or 14 February 2024. Father was also required to pay this distributive award on top of the $51,273.75 purge payment the court imposed for contempt in October 2023. We address Father's ability-to-pay issue in our discussion of the contempt order below.

remand for a new order, the unequal distribution and the distributive award are necessarily vacated, and we need not reach those arguments. On remand, the court may make an equal distribution or, if the evidence and the court's new findings support doing so, may make an unequal distribution. If the presumption of an in-kind distribution is rebutted, the court "must make findings of fact and conclusions of law in support of that determination." *Urciolo v. Urciolo,* 166 N.C. App. 504, 507, 601 S.E.2d 905, 908 (2004) (citation omitted).

We express no opinion on whether the distribution should be equal or unequal or whether a distributive award should be made, because new findings of fact on the marital estate's value and the marital assets' distribution must be made on remand.

**B.  Alimony**

In the same order, the trial court awarded Mother alimony. Father argues that the evidence does not support the trial court's findings underlying the alimony award; in particular, its findings on the parties' incomes and expenses. Mother responds that we can "surmise . . . that the amount listed in [her] [f]inancial [a]ffidavit is the same number the trial court found as [her] monthly income in [f]inding of [f]act 13 ($5,132.56)."[21] In her view, the court's findings as to her income and needs must be

---

[21] This is a typographical error—finding 13 states that Mother "earn[ed] $5,132.*85* per month with a net income of $1,433.19." (Emphasis added.)

supported by the affidavit and the "binder full of documents" she brought to the hearing.

Consistent with our discussion above, we will not penalize Father under these unusual circumstances for the trial court's failure to attach the affidavit to its order. And once again, we cannot "surmise" what may have been in the binder of documents. We thus consider only Mother's testimony at the equitable distribution and alimony hearing.

Twenty-nine days before that hearing, the trial court entered a child support order finding that Mother's gross monthly income was $8,000.[22] Mother's testimony makes clear that her employment had not changed between the two hearings. Yet in the order on appeal, the trial court made the following findings regarding her income:

> 13. [Mother] sought employment after the parties separated and is currently employed at Belay/Torchwood Consultancy as a Virtual Assistant earning $5,132.85 per month with a net income of $1,433.19.
> . . . .
>
> 24. The court finds that [Mother] has reasonable and necessary expenses totaling at least $3,059.73 . . . leaving [Mother] with a monthly deficit of $1,626.54.

The evidence does not support the trial court's finding on Mother's income. At the equitable distribution and alimony hearing, Mother gave conflicting testimony about her monthly income, stating amounts ranging from $6,400 to $6,900 within six

---

[22] The child support order was not appealed.

transcript pages. And she gave this testimony *while* emailing her affidavit to the court because, she said, "it didn't print very–very well." This suggests that she had the document available—both on paper and on her screen—at that moment. Mother testified:

> [Court]: Okay. Um, what is–I have your monthly income. What's your monthly income?
>
> [Mother]: [$6,900]–I'm sorry, [y]our Honor, it's in–it's in that paperwork here. Uh, after adjusted?
>
> [Court]: No. Just tell me what you made. This is just for attorney's fees. I have to–
>
> [Mother]: It's [$6,800] and some odd change.

A few moments later—after she asked whether the trial court could modify the child support order—Mother testified that at the child support hearing about a month earlier, she had "overestimated [her income]." She said that she "made [$8,000] a month," when she was "really making [$6,400], [$6,500]–[$6,700]." On top of that, she "didn't factor any of the things for the kids." At no point did Mother testify to a gross monthly income below $6,400, even while simultaneously emailing her affidavit to the court.

The trial court found that Mother's gross monthly income was $5,132.85, with a net monthly income of $1,433.19. Its finding on Mother's expenses references the "attached [f]inancial [a]ffidavit," but again, no affidavit is attached. We must rely

solely on the testimony in the transcript, and that testimony cannot support the court's findings as to Mother's income and expenses.

The evidence likewise fails to support the trial court's findings as to Father's income and expenses. At the hearing, the court indicated that it was relying, at least in part, on evidence from the child support hearing to determine Father's income:

> [Court]: When we had the child support hearing, I looked at the bank statements in here and the only one had the deposits of like [$9,000]. Is that where the [$9,000] came from, the child support?
>
> [Mother]: That's where it came from, right.
>
> [Court]: Okay. So I will use that for his income.

But the court did not find Father's income to be $9,000 per month; it found his income was $9,961.01 per month.

In the order dismissing Father's post-trial motion, the trial court identified the source of the evidence underlying its findings about Father's financial circumstances:

> 13. The majority of the financial documents this [c]ourt used at the [e]quitable [d]istribution and [a]limony trial came from the [p]ermanent [c]hild [s]upport trial that [Father] attended.
>
> 14. Many of the findings related to [Father's] income were derived from the [c]hild [s]upport hearing in this matter.

The trial court's reliance on evidence from the child support hearing creates two independent problems for our review.

First, if the court relied on financial evidence from the child support hearing to make findings in the equitable distribution and alimony order, that evidence was not offered at the later hearing and cannot support those findings on appeal. As this Court observed in *Hensey v. Hennessy*:

> [I]t should be obvious that the evidence which must "be taken orally in open court" must be taken *in the case which is at bar*, not in a separate case which was tried before the same judge. Appellate review of the sufficiency of the evidence to support the trial court's findings of fact is impossible where the evidence is contained only in the trial judge's memory.

201 N.C. App. 56, 67-68, 685 S.E.2d 541, 549 (2009). Unlike *Hensey*, the evidence of Father's income here came not from the judge's memory but from "financial documents" presented at the child support hearing, so that evidence could be available for review. But those documents are not in our record because, once again, they were not presented as evidence *at the equitable distribution and alimony hearing*, so we cannot review them to assess whether they support the trial court's findings. *See id.*

Second, even if the trial court could rely on evidence from the child support hearing, the income findings in the equitable distribution and alimony order are internally inconsistent with the findings in the child support order. Because no party appealed the child support order, we must assume its findings were supported by the evidence presented at that hearing. The child support order found Mother's gross monthly income was $8,000 and Father's was $9,000. Yet the equitable distribution

and alimony order found Mother's income was $5,132.85 and Father's was "at least" $9,961.01 per month—based, apparently, on deposits reflected in a single monthly bank statement. No such bank statement is in the record. Simply put, we cannot reconcile these findings based on the record before us.

Because the trial court's findings on both parties' income and expenses are unsupported by the evidence, we vacate the alimony portion of the order and remand for entry of a new order. On remand, the court shall receive evidence on the parties' income and expenses and enter a new order with findings of fact sufficient to support any alimony award.

## C. Civil Contempt Order

Father's second appeal is from the trial court's civil contempt order entered on 17 October 2023, "including any intermediate orders involving the merits and necessarily affecting the said order." This order addresses contempt related to three underlying orders: (1) the equitable distribution and alimony order, (2) the civil injunction consent order, and (3) the child support order. As mentioned earlier, Mother filed four motions for contempt alleging various failures by Father to comply with these three orders. The trial court's amended order to show cause—issued on 29 August 2023—required Father to appear and show cause on all these claims.

Before turning to the merits: Father argues that "[t]he trial court did not have jurisdiction to enforce the [equitable distribution] and alimony order using contempt" before his "deadline to appeal from the [equitable distribution] and alimony order had

run." Because we vacate the equitable distribution and alimony order, any contempt finding based on it falls too. [23]

Some of Father's arguments relate only to contempt of one of the three underlying orders. We examine each separately.

### 1. *Contempt of Equitable Distribution and Alimony Order*

We have already vacated the equitable distribution and alimony order, so we must also vacate the civil contempt order to the extent it rested on that order, as well as the related order for arrest entered on 15 September 2023.[24]

### 2. *Contempt of Civil Injunction Consent Order*

Father asserts that "it is not 100% clear whether the trial court held [him] in contempt for violations of the injunction."[25] He has a point. The contempt order includes six paragraphs of findings on Father's alleged violations of the civil injunction consent order, quoting some of its provisions. But the court did not mention the civil injunction consent order in its conclusions of law. It concluded only

---

[23] Father was also held in contempt of the child support order and, possibly, the civil injunction consent order. Neither of those orders was appealed, and Father does not argue that the trial court lacked jurisdiction to enforce them through contempt proceedings.

[24] The order for arrest was based only on Father's failure to appear on 12 September 2023 as directed by the amended order to show cause, but it required Father to post a bond of $51,273.75 to be released from custody—the same amount the civil contempt order set as the purge condition. Because we vacate the civil contempt order's purge condition in that amount, we also vacate the order for arrest.

[25] The amended order to show cause directed Father to show cause only as to the equitable distribution and alimony order and the child support order—*not* the civil injunction consent order. Earlier show cause orders, entered on Mother's *pro se* motions, did include the civil injunction consent order. And the contempt order on appeal made findings about alleged violations of the civil injunction consent order. Those findings, however, clearly concern only civil contempt, not criminal.

that the child support order and the equitable distribution and alimony order "*remain in force.*" (Emphasis added.) Because it is unclear whether Father was held in contempt of the civil injunction consent order, and because we ultimately vacate and remand, we discuss his argument.

The first of four factors required for continuing civil contempt is that "[t]he order remains in force." N.C. Gen. Stat. § 5A-21(a)(1) (2023). Father's argument on this point is straightforward. The civil injunction consent order expired by its own terms on 22 July 2023. The contempt hearing was held on 12 September 2023. The contempt order was entered on 17 October 2023. So both dates fell after the civil injunction consent order had expired. Because the civil injunction consent order was no longer "in force" at the time of either the hearing or the entry of the contempt order, Father could not be held in contempt for violating it. We therefore vacate the contempt order's findings about Father's violations of the civil injunction consent order (findings 14, 15, 16, 17, 18, and 19) and any contempt finding based on that order.

### 3. *Contempt of Child Support Order*

Father's remaining arguments concern his civil contempt for failing to pay child support. He argues that the trial court erred because its "findings of fact regarding contempt of the child support order are not supported by the evidence and [its] conclusion that he is in contempt of the child support order is not supported by

the findings." Specifically, Father challenges findings 33, 37, 38, 39, 40, and 47 as "not supported by the evidence."

When reviewing a contempt order, this Court "is limited to determining whether there is competent evidence to support the trial court's findings and whether the findings support the conclusions." *Shumaker v. Shumaker*, 137 N.C. App. 72, 77, 527 S.E.2d 55, 58 (2000) (citation omitted).

The findings relevant to Father's arguments are as follows:

> 30. Father still operates United Auto LLC, a used car dealership.
>
> 31. As of this hearing, the used car market is doing well during these times.
>
> 32. Father is the sole shareholder of United Auto, LLC and therefore retains all profit generated by this entity. Previously, this [c]ourt has found that the annual average profit generated by United Auto, LLC totaled $171,122.54.
>
> 33. During the exchanges of the minor children, Father is driving an expensive car that is worth somewhere around $20,000.00-$50,000.00.
> . . . .
>
> 37. The noncompliance by Father is willful.
>
> 38. Father has refused and continues to refuse to comply with the terms of this [c]ourt's orders. Father's conduct is willful, wanton, and in direct disobedience of this [c]ourt's orders and constitutes civil contempt of [c]ourt.
>
> 39. Father's conduct is a continuing contempt. The purpose of the orders will be served by Father's continued compliance with the terms of the orders.

40. At all times since entry of the above-referenced orders, Father has had the ability to comply with the terms of the [c]hild [s]upport [o]rder and the [equitable distribution and alimony] [o]rder and has the continuing ability to do so.

. . . .

47. Father is in civil contempt and may purge himself by paying Mother $51,273.75 within fourteen days of the entry of this order.

Based on these and other findings, the trial court ordered:

1. Father is in direct contempt of [c]ourt for failing to appear for this matter on [12 September] 2023.

2. This [c]ourt shall enter an [o]rder for [a]rrest based on Father's failure to appear for this matter. Father shall turn himself in before 5:00 [p.m.] on [12 September] 2023.

3. Father is in civil contempt of this [c]ourt for his failure to abide by [the c]hild [s]upport [o]rder and the [equitable distribution and alimony] [o]rder of this [c]ourt.

4. Father may purge himself by paying Mother $51,273.75 within fourteen days of the entry of this order.

5. If Father has not purged himself of contempt within fifteen . . . days of the entry of this order, then Father shall appear in [c]ourt on [27 October] 2023 at 9:00 am . . . and he shall go into custody until he has purged his contempt.

6. This order shall be subject to the [c]ontempt [p]owers of this [c]ourt.

   a. *Burden of proof and challenged findings of fact*

The trial court issued an amended order to show cause directing Father to

appear "to [s]how [c]ause why he should not be held in contempt." When a court issues such an order based on a showing of probable cause, "[t]he burden then moves to the opposing party to show cause why he should not be found in contempt of court." *Id.* at 76, 527 S.E.2d at 57. That party "has the burden of proving either that he lacked the means to pay or that his failure to pay was not willful." *Id.* The burden thus fell on Father to show that he was not in willful contempt.

Father recognizes that the amended show cause order shifted the burden to him to "prove that he is not in contempt," but argues that the trial court must still make findings of fact supported by competent evidence that his failure to pay was willful and that he had the ability to comply both during the period of nonpayment and as of the hearing date. *See, e.g., Cnty. of Durham by & through Durham DSS v. Hodges*, 257 N.C. App. 288, 297, 809 S.E.2d 317, 324 (2018) (holding that even though "the burden to show cause shift[ed] to the defendant, our case law indicates that the trial court cannot hold a defendant in contempt unless the court first has sufficient evidence to support a factual finding that the defendant had the ability to pay, in addition to all other required findings to support contempt" (citations omitted)). Father concedes that Mother's testimony supports the findings that he failed to make the required monthly payments under the child support order. But that "leaves the question of whether his non-compliance is willful and whether he has the ability to comply." Because willfulness depends on ability to comply, Father argues, his ability to comply is "the crux of the inquiry."

The amended civil contempt motion identified the child support order's provisions Father allegedly violated, the payments he had failed to make, and alleged he had the ability to pay but willfully failed to do so. Father bore the burden of proving why he should not be held in willful contempt for failure to pay child support. He did not appear.

In its findings, the trial court quoted the child support order's provisions requiring Father to pay $1,239.93 per month in child support beginning 1 May 2022 and an additional $250 per month toward established arrearages of $12,399.30 until paid in full. The court found that Father had paid Mother only $1,000 "since entry of the [c]hild [s]upport [o]rder" and owed $17,598.95 in unpaid child support and arrearages[26] as of 12 September 2023. It also found that (1) Father continues to operate United Auto LLC, a used car dealership, as its sole shareholder; (2) the court had previously found the business generated an annual average profit of $171,122.54; (3) the used car market was "doing well during these times"; and (4) Father was driving "an expensive car" worth between $20,000 and $50,000 during custody exchanges.

Based on these findings, the trial court concluded that Father's noncompliance was willful, that he had the ability to comply with the child support order at all times

---

[26] The "arrearages" refer to the past-prospective child support of $12,399.30 ordered in the child support order. The "unpaid child support" refers to the child support not paid since entry of the child support order.

since its entry, and that he had the continuing ability to do so. Father failed to appear and present evidence to rebut these findings. They were sufficient to support holding Father in civil contempt for his failure to pay child support during the arrearage period.

But the trial court also had to make findings, supported by evidence, of Father's present ability to pay any purge payment ordered as of the date of the contempt hearing. As we recently explained in *Roybal v. Raulli*:

> [I]n order to address the requirement of willfulness, the trial court must make findings as to the ability of the contemnor to comply with the court order during the period when in default. . . . [O]nce the trial court has found that the party had the means to comply with the prior order and deliberately refused to do so, the court may commit such party to jail.

No. COA23-983, ___ N.C. App. ___, ___, ___ S.E.2d ___, ___ (2026) (citation omitted). But at that point, "the court must find that the party has the present ability to pay the total outstanding amount." *Id.* Said differently, "a person in civil contempt holds the key to his own jail by virtue of his ability to comply with the court order." *Collins v. Holley*, 299 N.C. App. 323, 335, 919 S.E.2d 24, 34 (2025) (citation and brackets omitted). So the findings must also address the contemnor's present ability to pay the total outstanding amount or any purge payment. *See Spears v. Spears*, 245 N.C. App. 260, 278, 784 S.E.2d 485, 497 (2016) ("[T]he trial court must find that [the obligor] has the ability to fully comply with any purge conditions imposed upon him.").

Father challenges the trial court's finding of his ability to pay the purge amount of $51,273.75 within fourteen days as unsupported by the evidence. The show cause hearing was held on 12 September 2023, but no evidence was presented on Father's income or the business's income in 2023. Mother first testified in detail about Father's civil injunction consent order violations. She then testified about his failures to (1) pay the child support and alimony as ordered and (2) take certain actions required by the equitable distribution and alimony order. She noted that Father's used car business was "still currently active" and in operation. She also testified that Father had recently been picking up the children for visitation in a "fairly new Mercedes" she believed was "an E320, 350." Based on her experience assisting with the business during the marriage, she estimated the car would be worth "somewhere in the twenty/thirty thousand range."

The trial court's finding about Father's ability to pay child support rested in part on its previous findings in the equitable distribution and alimony order, which we have now vacated. The court found that Father was still operating "United Auto LLC, a used car dealership"; that the "used car market is going well"; that Father is the "sole shareholder" of United Auto; and that "*[p]reviously*, this Court has found that the annual average profit generated by United Auto LLC totaled $171,122.54." (Emphasis added.) But that profit figure was based on outdated data.

The trial court had made these findings about the business's profits in the equitable distribution and alimony order:

> 8. The parties own and operated a car dealership, United Auto LLC, which was the primary source of income for the family. The car dealership was acquired on [8 August] 2013 by both [Father] and [Mother].
>
> 9. According to sales records dated [1 January] 2018 to [31 December] 2020 for the car dealership, the business had an annual average profit of $171,122.54.

By the court's own finding, the "annual average profit" figure was based on the period from 2018 to 2020. The contempt hearing took place on 12 September 2023—three years after the end of that period. Even if we had not vacated the equitable distribution and alimony order, business profits from three years earlier would not establish Father's present ability to pay a purge amount of $51,273.75.

The only other evidence bearing on Father's current ability to pay was that he had recently been "driving" a "fairly new Mercedes" worth somewhere in the $20,000 to $30,000 range. In finding 33, the court found that "[d]uring the exchanges of the minor children, Father is driving an expensive car that is worth somewhere around $20,000.00-$50,000.00." But the evidence does not support a finding that the car was worth up to $50,000. Mother's testimony valued the car at "somewhere in the [$20,000]/[$30,000] range." Father rightly notes that no evidence showed that he owned the car—Mother's testimony was only that he was "driving" it.[27]

---

[27] And as a used car dealer, Father may very well drive vehicles from his business inventory that he does not own personally.

Mother's attorney *argued* in closing that Father had "showed up in a [$50,000] car" and could "sell that car and Uber for the rest of his days" to pay his arrearages. But "it is axiomatic that the arguments of counsel are not evidence." *Crews v. Paysour*, 261 N.C. App. 557, 561, 821 S.E.2d 469, 472 (2018) (citation omitted). The evidence did not support the trial court's finding that the car may be worth up to $50,000—even assuming Father owned it, and it was unencumbered by debt.

"Ability to comply has been interpreted as not only the present means to comply, but also the ability to take reasonable measures to comply." *Collins*, 299 N.C. App. at 335, 919 S.E.2d at 34 (citation omitted). "A general finding of present ability to comply is sufficient when there is evidence in the record regarding the contemnor's assets." *Id.* The erroneous finding on the car's value is significant because the trial court set the purge amount at $51,273.75, payable within fourteen days. When the trial court asked Mother's counsel about Father's ability to pay, counsel offered three reasons: first, the amended show cause order placed the burden of proof on Father and he did not appear; second, Father was still "actively involved in his business"; and third, "he showed up in a [$50,000] car." The finding that the car was worth up to $50,000 is not supported by the evidence, and the remaining findings do not

support the court's conclusion that Father had the present ability to pay $51,273.75 within fourteen days.[28]

Father raises an additional argument about the civil contempt order's purge conditions. Although we must vacate the entire order for the reasons discussed, we address this argument as well because it may be helpful on remand.

### b. *Springing contempt provision*

Father contends that the trial court erred as a matter of law by ordering him to "appear in [c]ourt on [27 October 2023] and . . . immediately go to jail at that time" if he failed to "purge himself of contempt within fifteen days of the entry of the order."

In the civil contempt order, entered *nunc pro tunc*[29] to 12 September 2023, the trial court ordered:

> 3. Father is in civil contempt of this [c]ourt for his failure to abide by [the c]hild [s]upport [o]rder and the [equitable distribution and alimony o]rder of this [c]ourt.
>
> 4. Father may purge himself by paying Mother $51,273.75 within fourteen days of the entry of this order.
>
> 5. If Father has not purged himself of contempt within fifteen . . . days of the entry of this order, then Father shall appear in [c]ourt on [27 October 2023] at 9:00 am . . . and he shall go into custody until he has purged his contempt.

---

[28] The trial court ordered Father to pay $51,273.75 within fourteen days but did not consider how his obligation to pay a $100,000 distributive award within 120 days of the equitable distribution and alimony order (or his ongoing monthly child support and alimony obligations) may have affected his ability to pay the purge amount.

[29] *See supra* footnote 9.

Father argues that delaying the purge deadline "does not fix the [court's] problem" of failing to find he had "the ability to avoid jail by making the purge payment" when the contempt order was entered. He further claims that "setting up a delayed system creates additional problems and is contrary to law."

By ordering him to "make a purge payment within [fourteen] days or report to court in [fifteen] days and immediately be jailed," the court "issued an order . . . predicting that" he "would have the ability to pay" at that later date. But the trial court "does not have a crystal ball," Father posits, so "there is no way that a trial court can know today what a party's financial situation will be at some point in the future."

The trial court set a future date for payment of the purge amount and ordered that if Father did not pay by that date, he would be incarcerated. This is known as a "springing" contempt order—one in which the "order for arrest and incarceration 'springs' into effect upon the respondent's future failure to comply with the monthly payment schedule." Cheryl Howell, *Contempt: NC Court of Appeals vacates a "springing" order for arrest*, School of Gov't (10 July 2025), https://civil.sog.unc.edu/contempt-nc-court-of-appeals-vacates-a-springing-order-for-arrest/. We recently confronted a similar provision in *Roybal v. Raulli*:

> "Springing" contempt orders have been described . . . as orders issued in child support enforcement proceedings to determine that a respondent is in civil contempt but stay incarceration and order the respondent to pay ongoing monthly payments until all arrears are satisfied. These

> orders often also provide that, if the respondent fails to make a monthly payment, the respondent is to be immediately arrested and incarcerated.

*Roybal*, No. COA23-1103, ___ N.C. App. at ___, ___ S.E.2d at ___ (citation omitted).

The contempt order here did not contain the repeated monthly payment "springs" present in *Roybal*, but even a single springing provision is too many. *See id.* Based on circumstances as of 12 September 2023, the trial court required Father to appear on 27 October 2023 and ordered that if he had not yet paid the $51,273.75 purge payment, he would be taken into custody until he paid. It contained no provision allowing Father to avoid incarceration by demonstrating that he lacked the ability to pay on 27 October 2023. But in a civil contempt order, the contemnor must "hold the key" to the jail *at the time set for the purge payment. See Collins*, 299 N.C. App. at 335, 919 S.E.2d at 34. A court cannot order incarceration on a future date based solely on evidence of a contemnor's financial circumstances as of an earlier date, without providing an opportunity for the contemnor to demonstrate an inability to pay at the later time. *Id.* at 334-35, 919 S.E.2d at 34.

c. *Attorney's fees award*

Father also challenges the trial court's order requiring him to pay Mother's attorney's fees arising from the civil contempt order. Because we vacate the civil contempt order, we also vacate the attorney fee's award. But for purposes of remand, we briefly address his argument.

The civil contempt order awards Mother $8,103 in attorney's fees but contains no findings identifying which claims the fees relate to. The trial court found only that "Mother has incurred attorney's fees as a result of the prosecution of *these motions*." (Emphasis added.) In the context of this order, "these motions" could encompass all of Mother's contempt motions.

The civil contempt statutes do not independently authorize an award of attorney's fees; there must be a statutory basis for any such award. *See Nohejl v. First Homes of Craven Cnty., Inc.*, 120 N.C. App. 188, 191, 461 S.E.2d 10, 12 (1995) ("Absent express statutory authority for doing so, attorney fees are not recoverable as an item of damages or costs." (citation omitted)). Attorney's fees may be awarded in child support and alimony proceedings under North Carolina General Statute Sections 50-13.6 and 50-16.4, respectively. *See* N.C. Gen. Stat. §§ 50-13.6 (2023) (Counsel fees in actions for custody and support of minor children), 50-16.4 (2023) (Counsel fees in actions for alimony, postseparation support). Attorney's fees may also be awarded in equitable distribution cases in limited circumstances. *See* N.C. Gen. Stat. § 50-20(i) (2023) (allowing fees "[u]pon application by the owner of separate property that was removed from the marital home or possession of its owner by the other spouse" for "reasonable counsel fees and costs of court incurred to regain its possession"); *see also* N.C. Gen. Stat. § 50-21(e) (2023) (allowing attorney's fees as a sanction when a "party has willfully obstructed or unreasonably delayed").

If the trial court awards fees on remand, it must make the appropriate findings of fact and conclusions of law specific to each claim and motion supporting the award. *See, e.g., Hill*, 261 N.C. App. at 631, 821 S.E.2d at 232 ("On remand, the trial court should make the required findings of fact and conclusions of law for the attorney fee award on each component of the award and determine the appropriate amount of fees for each claim.").

## C. Conclusion and Instructions for Remand

### 1. *Equitable Distribution and Alimony Order*

For the reasons above, we vacate the equitable distribution and alimony order in part. The trial court's conclusions of law and decree are vacated. All findings of fact are vacated except those noted below.

#### a. *Equitable distribution claim*

On remand, the trial court shall hold a hearing to allow the parties an opportunity to present evidence on the net value of the marital assets listed in the first column of finding 34 as of the date of separation and the date of the distribution. Circumstances may have changed since the 20 October 2023 hearing.

The court shall address only the marital assets already identified as marital in finding 34. Neither party may present evidence of other alleged marital assets. Because we vacate each asset's valuation, the court shall receive additional evidence on remand as necessary to make findings on each marital asset's net value at the date of separation and the date of distribution. If sufficient evidence is not presented to

establish an asset's net fair market value at the date of separation, the trial court shall not value or distribute that asset. And if the court determines that no credible evidence of a marital asset's date-of-separation value was presented, it shall not distribute that asset.

The trial court may appoint an expert to value any marital asset and allocate the cost between the parties as it deems appropriate.

The parties remain bound by the findings not challenged on appeal or affected by our rulings—findings 1–12, 14, 15, 20, and 30. But finding 37, which addresses distributional factors, is based in part on findings we have vacated. So finding 37 is vacated too, and the trial court must make new distributional findings and related conclusions on remand.

### b. *Alimony claim*

On remand, the trial court must also hold an alimony hearing to receive new evidence. This hearing may be combined with the equitable distribution hearing or held separately, in the trial court's discretion.

The parties remain bound by the same findings listed above—findings 1–12, 14, 15, 20, as well as finding 30. The trial court must make new findings about both parties' incomes, their reasonable expenses, and any other facts required by North Carolina General Statute Section 50-16.3A based on the evidence presented.

### 2. *Contempt Order and Order for Arrest*

We affirm these findings in the contempt order: 1–12, 20, 22–24, 30–34, 35

(regarding child support order only), 36 (regarding child support order only), 37, and 38–40 (regarding child support order only). We also affirm conclusions of law 1–6 (regarding child support order only).

We vacate the contempt order to the extent it addresses the civil injunction consent order, the equitable distribution and alimony order, and attorney's fees. The decree is vacated in its entirety. The order for arrest entered on 15 September 2023 is vacated in its entirety.

On remand, the trial court must hold a hearing on Father's civil contempt of the child support order. The court must receive evidence and make findings based on that evidence about Father's present ability to pay any purge condition as of the date of that hearing. The hearing may be combined with the equitable distribution and alimony hearing or held separately, in the court's discretion.

After the hearing, the trial court shall enter a new contempt order addressing Father's civil contempt of the child support order as of 12 September 2023. The court may award Mother attorney's fees for the child support contempt matter if supported by the evidence and applicable law.

24-344 VACATED IN PART AND REMANDED.

24-638 VACATED IN PART AND REMANDED.

Judge STADING concurs.

Judge MURRY concurs in result only.